IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT E. MILLER,                  )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        )   Civil Action No. 06-789
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Robert E. Miller and Defendant Michael J. Astrue, Commissioner of Social Security.[1]   Plaintiff seeks review of a final decision by the Commissioner denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*.   For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

### II.   BACKGROUND

#### A.    Factual Background

Robert Miller worked at Armstrong Cement & Supply Company

---

[1]  Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

("Armstrong") for more than 15 years before he injured his back while shoveling sand. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 118.)   On November 23, 1986, Mr. Miller was using a heavy bar to loosen sand stored in a silo when "something just snapped and popped" in his lower back. (Tr. 432.) He was treated for a lumbar strain for about a month by a company doctor, then consulted with an orthopedist, Dr. Peter N. Sotos, who in turn recommended that he see Dr. Richard Kasdan, a neurologist.

Plaintiff was first treated conservatively using a TENS unit,[2] physical therapy, ultra-sound, heat massage, and pain medication. (Tr. 235.)   He also attempted to lose weight since his obesity was compounding his back pain.   Although he experienced some improvement with this course of treatment, he continued to complain of back and right leg discomfort. By March 1987, Dr. Kasdan was concerned that the suspected lumbar strain had not improved and arranged a CT scan to rule out evidence of a herniated disc.   (Tr. 231.)   After reviewing the CT scan, which showed a calcified disc at the right of L4-L5 and "significant pathology on the left at L5-S1," he sent Mr. Miller to a neurosurgeon, Dr. Peter Sheptak, for

---

[2] A transcutaneous electrical nerve stimulation or "TENS" unit provides electrical stimulation of nerves for relief of pain, either by electrodes attached to the skin or by an apparatus manually held against the skin.   The stimulus interferes with neural transmission of pain signals and thus has an analgesic effect. See the on-line version of DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S"), at http://www.mercksource.com, last visited June 1, 2007.

further evaluation.   (Tr. 222.)

Dr. Sheptak agreed with Dr. Kasdan that the cause of Plaintiff's symptoms was "true discogenic disease at L4-5 where a right paracentral disc bulge is present with overt lumbar and lateral recess stenosis.[3]"   (Tr. 221.)   Dr. Sheptak subsequently performed a lumbar decompressive laminectomy at L3-S1 on May 11, 1987, without complications.   (Tr. 246-247; 241-242.)   Follow-up treatment consisted of more physical therapy, exercise, and pain medication.

Although Plaintiff initially did well after the surgery, the pain in his right hip returned after a few months.   A lumbar myelogram on October 27, 1987, showed distortion of the dural sac and a pseudomeningocele[4] at the L-5 level.   (Tr. 201-205.)   He received intra-venous steroids for five days, along with physical therapy, but soon thereafter developed severe pain in his right leg and buttock almost exactly like that he had experienced prior to his May 1987 surgery.   The myelogram also disclosed a fistula in the subarachnoid space which may have caused the dizziness and head pain Mr. Miller experienced when bending over, along with calcific impingement on the thecal sac to the left at L5-S1.   (Tr. 189.)

_____

[3] Spinal stenosis is defined as "the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space."   See DORLAND'S.

[4] A meningocele is a hernial protrusion of one of the three membranes that envelop the brain and spinal cord (the dura mater, pia mater and arachnoid) through a bony defect.   See DORLAND'S.

3

On December 1, 1987, Mr. Miller underwent a re-exploratory lumbar laminectomy at L4-S1, along with decompression of the L5 and S1 nerve roots, excision of an L5-S1 disc, and repair of the pseudomeningocele. (Tr. 191-192; 197-198.)  After ten days in the hospital, Mr. Miller was released.

Mr. Miller returned to Dr. Kasdan in April 1988 for a check-up.  A CT scan revealed that the surgery had considerably reduced the calcific spur, although there were still pieces of calcium present. At the L4-L5 disc space, there was a mid-line bulge with calcification on the posterior disc margin, producing mild stenosis.  (Tr. 283.)  Dr. Kasdan informed Armstrong's workers compensation carrier, Rockwood Insurance ("Rockwood") that he was "not optimistic" about Mr. Miller returning to his previous work "in the near future."  (Tr. 284.)

Dr. Sheptak's examination on May 11, 1988, showed that the pseudomeningocele appeared to be gone and there were still calcific traces, but no overt nerve root impingement. (Tr. 281.) He noted that Plaintiff continued to have "mechanical type low back pain without much [sic] radicular symptoms," and pain in his leg associated with intense activities which lessened as long as he was "relatively quiescent."  (Id.)  Dr. Sheptak wrote to Dr. Kasdan that he believed it would be in Mr. Miller's "best interests to be termed totally disabled for his previous occupation."  (Id.)

Sometime prior to June 22, 1988, Dr. Sheptak was apparently

4

asked by Rockwood to complete a physical abilities evaluation.   He replied, "I am not aware of what Mr. Miller's physical capabilities are and suggest that you obtain a work tolerance evaluation by the Forbes Back Institute as I do not perform these types of evaluations."   (Tr. 280.)

Following another examination by Dr. Kasdan in November 1988, he wrote to Rockwood that Plaintiff had "improved considerably," although he continued "to have some back discomfort with occasional radiation into his leg."   Mr. Miller had lost 20 pounds and was adhering to his exercise program which included walking one to one and a half miles a day.   Dr. Kasdan encouraged Plaintiff to increase his back exercise program so he could return to work as a stockroom clerk with Armstrong.   (Tr. 275.)

At Dr. Kasdan's direction, Mr. Miller began a program of physical therapy three days a week, with home exercise, ultrasound, and moist heat treatments also prescribed.   According to the medical record, he maintained this program - as directed - from January 16 through April 19, 1989.   (Tr. 297-300.)   He also underwent a work tolerance screening evaluation at Forbes Back Institute in January 1989 at Dr. Sheptak's direction, which recommended "an aggressive work hardening program," a strengthening and conditioning program concentrated on his hip and trunk flexors and extensors which showed muscular weakness, and a cardiovascular fitness program to increase his aerobic conditioning.   (Tr. 290-

5

293.[5])  The record does not include any evidence to show that this work hardening program was carried out.

On September 29, 1989, Mr. Miller was again evaluated by Dr. Kasdan, who opined that he believed Plaintiff was limited to full-time light duty work without repetitive lifting over his head of anything greater than 50 pounds.  He also provided a physical capacities checklist to Rockwood.  (Tr. 287-288.)

On February 20, 1990, Dr. Sheptak sent a note to Dr. Kasdan. In it he stated that Mr. Miller had come to his office that day

> complaining of significant back and right leg complaints.
> All mechanical activities aggravate this pain.  He is
> even uncomfortable while sitting and laying [sic] down.
> His left leg remains relatively asymptomatic.
>
> His exam today showed evidence of an antalgic gait
> favoring the right leg.  He had limited range of back
> motion because of lumbosacral spasm and tenderness.  Back
> motion was limited in all directions, at least 50%.  He
> had a positive straight leg raise on the right side at 45
> degrees.  Straight leg raise was negative on the left.
> I could demonstrate no motor changes.  There was some
> sensory changes [sic] in the right foot and calf.  His
> ankle reflex was diminished.
>
> His most recent CT scan done at Dr. Kasdan's office [on
> September 29, 1989] was reviewed.  He shows evidence of
> his previous decompression and also osteophyte formation
> and degenerative disc disease primarily at the L5-S1
> area.  Associated stenosis is present above this.
>
> On the basis of his past history and present examination
> symptoms today, I feel this man is totally and
> permanently disabled for any and all occupations.  I
> advised him to apply for social security disability as

---

[5] The Court notes that the report provided by the Forbes Back Institute program is incomplete in that pages 2, 4, and 6 are missing.

6

well.

(Tr. 282.)

Sometime shortly before February 27, 1990, a Rockwood claims examiner wrote to Armstrong's vice president of operations. In his letter, he quoted a statement by Dr. Kasdan:

> There has been some question as to whether Mr. Miller is capable of doing [a] light duty, storeroom job. . . . My initial response was that he could do this as long as his lifting of objects over his head did not exceed 50 pounds repetitively. It appears according to Mr. Miller than many of the small parts that he is asked to lift over his head in this storeroom exceed this amount. Therefore, in order to avoid the confusion, I would say that he can do a job in [a] storeroom as long as he were allowed to take intermittent breaks that allowed him to sit down for 10 minutes at a time every two hours. In addition, he should not be lifting repetitively boxes containing weights over 25 pounds. He can occasionally lift boxes weighing 50 pounds over his head, but not repetitively.

(Tr. 136, emphasis in original.)

Mr. Miller did not return to work. In October 2001, he and Armstrong entered into a compromise and release agreement in which he received a lump-sum payment in lieu of continued medical compensation benefits for his injury of November 23, 1986. (Tr. 108-112.)

B.    Procedural Background

On June 18, 2003, Mr. Miller protectively filed for disability insurance benefits, alleging disability as of the date of his back injury due to spinal stenosis, asthma, high blood

7

pressure, and borderline diabetes.[6]   (Tr. 39; 67-69.)  On August
7, 2003, the Social Security Administration ("SSA") advised Mr.
Miller it had concluded he was not disabled.   (Tr. 40-43.)
Plaintiff requested a hearing,[7] which was held before Judge John J.
Mulrooney on October 4, 2004, where Plaintiff was represented by
counsel.  Judge Mulrooney issued his decision on December 16, 2004,
again denying benefits.  (Tr. 23-33.)   Following Mr. Miller's
appeal and two requests for extensions of time to respond, the
Social Security Appeals Council informed Mr. Miller on April 12,
2006, that it declined to review the ALJ's decision, finding no
error of law or abuse of discretion and concluding the decision was
based on substantial evidence to support the ALJ's findings.  (Tr.
5-8.)  Therefore, the December 16, 2004 opinion became the final
decision of the Commissioner for purposes of review.  42 U.S.C. §
405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir.
2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff
filed suit in this Court on June 14, 2006, seeking judicial review
of the ALJ's decision.

---

[6]   This appears to have been Mr. Miller's second application for
DIB (*see* Tr. 113, referring to denial of a previous request for
reconsideration dated August 10, 1990).

[7]   Although this request was untimely in that it was filed more
than 60 days after the presumed date of receipt of the notice denying
his application for DIB, the SSA subsequently determined that the
delay resulted from good cause and therefore granted the request.
(*See* Tr. 14-16, 46-53.)

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

**III. STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, id. at 401.  "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision

9

and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[8] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to

---

[8] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

10

last for not less than twelve months. Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000); 42 U.S.C. § 1382c(a)(3)(C)(I).

To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Miller satisfied the first two non-medical requirements, and the parties agree that Mr. Miller's date last insured was March 31, 1991. Therefore, the critical evidence in this case relates to Mr. Miller's medical condition between the date of his injury on November 23, 1986, and March 31, 1991.

In determining a claimant's rights to DIB,[9] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

---

[9] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under either type of benefits.

11

(4)   if the claimant retains sufficient residual functional capacity ("RFC")[10] to perform his past relevant work, he is not disabled; and

(5)   if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[11] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Mulrooney first concluded that Mr. Miller had not engaged in substantial gainful activity since November 23, 1986. (Tr. 24.)  In resolving step two in Plaintiff's favor, the ALJ found that as of the date last insured, Mr. Miller suffered from degenerative disc disease of the lumbosacral spine and chronic obesity, both of which were "severe"

---

[10]   Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations.  Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).  Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[11]   Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage.  Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

12

impairments as that term is defined by the SSA.[12]  (Id.)  He further
concluded that two abdominal surgeries which had been performed
years before had no more than a *de minimis* effect on Plaintiff's
ability to perform substantial gainful activity through his date
last insured and were therefore non-severe.[13]  (Id.)

At step three, the ALJ concluded none of Plaintiff's
impairments satisfied any of the criteria in the relevant Listings,
i.e., Listing 1.00 (musculoskeletal impairments), Listing 3.00
(respiratory system), Listing 4.00 (cardiovascular system), or
Listing 9.00 (endocrine system.)  (Tr. 25.)  At this step, he
explicitly found that Plaintiff's degenerative disc disease did not
satisfy either Listing 1.02 (major dysfunction of a joint(s) due to
any cause)or Listing 1.04 (disorders of the spine.)  (Id.)  He also
noted that although Plaintiff had problems with reading and
mathematics, he had been able to perform semi-skilled work for a

---

[12]  *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b),
stating that an impairment is severe only if it significantly limits
the claimant's "physical ability to do basic work activities," i.e.,
"abilities and aptitudes necessary to do most jobs, including, for
example, walking, standing, sitting, lifting, pushing, pulling,
reaching, carrying or handling," as compared to "a slight abnormality"
which has such a minimal effect that it would not be expected to
interfere with the claimant's ability to work, regardless of his age,
education, or work experience. Yuckert, 482 U.S. at 149-151.  The
claimant has the burden of showing that the impairment is severe.  Id.
at 146, n5.

[13]  The ALJ later noted in his analysis that there was no medical
evidence of Plaintiff's other alleged impairments, i.e., high blood
pressure, asthma, borderline diabetes mellitus, degenerative joint
disease, and a history of deep vein thrombosis and colon polyps, prior
to his date last insured.  (Tr. 28.)  Plaintiff does not dispute this
finding and the Court will not address these impairments.

number of years and no medical source had noted signs of a learning disability. (Tr. 28.)

At step four, the ALJ concluded Mr. Miller could not perform his past relevant work as a raw and finish oiler/laborer, a position described by Eugene E. Hoffman, the vocational expert ("VE") who testified at the hearing, as medium to heavy semi-skilled work. (Tr. 30; *see also* Tr. 442.) However, relying on Mr. Hoffman's testimony, the ALJ concluded that Plaintiff was capable of a significant range of unskilled sedentary[14] work with several postural and other limitations. (Tr. 30-31.) Sedentary positions available in the local and national economies included surveillance system monitor, small products assembler, and hand packager of small products. Although the latter two were identified in the *Dictionary of Occupational Titles* as light to medium work, they could also be performed at the sedentary level according to the VE. (Tr. 31; *see also* Tr. 444-445.)

Therefore, based on Plaintiff's status as a "younger"

---

[14] The term "sedentary" describes work which requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Such work should not involve significant stooping. Jobs are sedentary even if walking and standing are required occasionally (i.e., up to one-third of the time) and other sedentary criteria are met. 20 C.F.R. § 404.1567. A sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour work day. Social Security Ruling 83-10.

14

individual,[15] with a high school education, a semi-skilled work history, and no transferable skills, together with the medical evidence of record and the testimony of the VE, the ALJ determined at step five that Mr. Miller was not disabled at any time through March 31, 1991, and therefore not entitled to benefits. (Tr. 31.)

B.   Plaintiff's Arguments

We turn to each of the four arguments raised by Plaintiff contending that the ALJ erred in this analysis.

1.   *The ALJ erred by concluding Plaintiff did not meet Listing 1.04, disorders of the spine.* We address this issue first because if we were to determine that the ALJ erred at step three of his analysis by concluding Mr. Miller did not satisfy any Listing, that error alone would be sufficient to remand the case or award benefits. *See* Ramirez v. Barnhart, 372 F.3d 546, 550-551 (3d Cir. 2004) (impairments described in the Listings are presumed by the SSA to render one disabled); *see also* 20 C.F.R. § 404.1520(d).

Listing 1.04 provides in relevant part:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

---

[15]   Plaintiff was 38 years old as November 23, 1986, and 42 as of his date last insured, making him a younger person according to Social Security regulations, i.e., under 50 years old. 20 C.F.R. § 404.1563(c).

15

> A. Evidence of nerve root compression
> characterized by neuroanatomic distribution of
> pain, limitation of motion of the spine, motor
> loss (atrophy with associated muscle weakness
> or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of
> the lower back, positive straight-leg raising
> test (sitting and supine)[.]

Plaintiff argues that there are "voluminous medical records" to indicate that he suffered from a herniated nucleus pulposus and spinal stenosis, accompanied by pain, muscle spasm, and significant limitation of motion in the spine. (Brief in Support of Plaintiff's Motion for Summary Judgment, Doc. No. 11, "Plf.'s Brief," at 16.) In addition, he showed "appropriate radicular distribution of significant motor loss with muscle weakness accompanied by sensory and reflex loss in his right extremity."[16] Plaintiff argues that by ignoring this evidence, the ALJ erred at step three by finding that he did not, in fact, meet Listing 1.04 prior to his date last insured. (Id. at 17.)

The law is clear that to be declared disabled at step three of the analysis, a claimant must "meet *all* of the specified medical criteria" set forth in the relevant listing. Santiago v. Comm'r of Soc. Sec., No. 04-4244, 2005 U.S. App. LEXIS 13333, *2 (3d Cir. July 5, 2005), *quoting* Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley,

---

[16] Plaintiff does not cite to the record for this statement and the Court has been unable to independently identify its source.

16

id.

Here, Plaintiff fails to point to any evidence in the record to support the medical criterion that he experienced long-lasting "compromise of a nerve root or the spinal cord." Prior to his second surgery in November 1987, Dr. Sheptak had noted that there was "some evidence of residual nerve root compression." (Tr. 188.) However, some six months following that surgery, Dr. Sheptak reported on May 11, 1988, that there was "no residual nerve root impingement." (Tr. 281.) Dr. Kasdan concurred that "Dr. Sheptak has very adequately decompressed him." (Tr. 284.)

Secondly, there is no evidence of "atrophy with associated muscle weakness or muscle weakness." In November 1987, during his preliminary examination prior to the second back operation, the examiner noted "muscle function revealed normal bulk and tone. Muscle strength is +5/5. Negative tremor or atrophy noted." (Tr. 194.) Several months later, Dr. Kasdan noted "no weakness or sensory loss and he has intact reflexes." (Tr. 284.) The only notes regarding atrophy or muscle weakness which could be identified by the Court date from August 1, 1994, where an independent medical examiner ("IME") noted "some atrophy of the right gluteus musculature" and "some weakness of the right hip extensors and knee flexors." (Tr. 389.) A second IME who examined Plaintiff in January 1999 noted that manual muscle testing revealed no focal muscle weakness and, in fact, Mr. Miller showed "quite

17

hypertrophied muscles." (Tr. 404.) Thus, even well after Plaintiff's date last insured, there is no evidence to support his claim that his condition satisfied all of the medical criteria of Listing 1.04.

2. *The ALJ improperly weighed the medical opinions of Plaintiff's treating physicians.* Mr. Miller argues that prior to his date last insured, Dr. Sheptak, who had provided most of his treatment, Dr. Kasdan, who also treated Plaintiff for his back injury, and Dr. Sotos, an orthopedist who treated him immediately after the accident, all agreed that he was disabled from all work. The ALJ erred by failing to give proper weight to the opinions of these doctors, finding only that they were "inconsistent with the totality of the evidence on and prior to March 31, 1991." (Plf.'s Brief at 14.)

Conversely, Defendant argues that the ALJ did not err by rejecting Dr. Sheptak's opinion for two reasons. First, the opinion of a treating physician may be given less weight if it is not well supported by medically accepted clinical and laboratory diagnostic tests and/or if it is inconsistent with other substantial evidence of record. (Defendant's Brief in Support of Motion for Summary Judgment, Doc. No. 13, "Def.'s Brief," at 9.) Secondly, a treating physician's opinion that a claimant is disabled or unable to work is not dispositive, inasmuch as this finding is reserved for the Commissioner. (Id.) Because the ALJ

18

specifically addressed and weighed the opinions of all of Plaintiff's physicians and resolved any conflicts among them, this Court is obligated to affirm the ALJ's conclusions in this regard. (Id. at 9-12.)

Plaintiff correctly states that under the well-established treating physician doctrine,[17] an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." (Plf.'s Brief at 13-14, citing, inter alia, Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).) Social Security regulations carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 404.1527(d). In general, every medical opinion received is considered. Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and

---

[17] Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. § 404.1502.

19

the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); *see also* Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001), and Sykes, 228 F.3d at 266 n7. The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

Here, the medical evidence shows that Plaintiff's two long-term treating physicians[18] differed somewhat in their views of his disability. Dr. Kasdan repeatedly referred to his expectations that Plaintiff would be able to return to work, in some capacity, if not to his previous strenuous work as a laborer. For example on March 9, 1987, prior to discovery of the herniated disc, he stated that he expected Mr. Miller to return to his employment "within a three to four week time." (Tr. 231.) Shortly before the second surgery in November 1987, he indicated "at the present time, [Mr.

---

[18] According to the medical record, Dr. Sotos treated Plaintiff only from January through April 1987. Although he evaluated Mr. Miller numerous times during that period, it is clear that the primary decisions about his treatment were made by Drs. Sheptak and Kasdan.

Miller] is totally disabled for his current employment" but reserved his opinion as to long-term disability until after the surgery. (Tr. 189.) A few months later, he wrote that he was "not optimistic about him returning to work in the near future as a mechanic," but that "some other kind of work" was a possibility. (Tr. 284.) In November 1988, Dr. Kasdan indicated he believed Mr. Miller had "sufficiently recovered" to return to work "as a stockroom clerk sorting and filing away nuts and bolts" although he could not return to his previous work which required repeated shoveling, bending and twisting. (Tr. 275.) He opined in October 1989 that he believed Mr. Miller's "work capacities are limited to those of full time light duty" without repetitive lifting above his head of weights greater than 50 pounds. (Tr. 287.) As late as 1995, he considered that Plaintiff was "still capable only of sedentary type work and is disabled for his job in construction." (Tr. 391.)

Dr. Sheptak first examined Mr. Miller at Dr. Kasdan's request in May 1987. Following the first surgery, he noted on September 23, 1987, that Plaintiff remained "temporarily disabled from employment." (Tr. 207.) On March 1, 1988, he indicated that "I doubt if he will ever get back to his previous occupation," but reserved final judgment about his ability to perform other work for a final examination scheduled for three months later. (Tr. 204.) He wrote to Dr. Kasdan in May 1988 that "I do not feel he is a

21

candidate to return to his previous occupation [and] it would be in his best interests to be termed totally disabled for his *previous* occupation" but offered no opinion about other types of work. (Tr. 281, emphasis added.) It was not until February 20, 1990, that Dr. Sheptak concluded, "[O]n the basis of his past history and present examination symptoms today, [Mr. Miller] is totally and permanently disabled for any and all occupations." (Tr. 282.)[19]

This is one of those relatively rare cases where two specialists[20] in the same field arrived at different conclusions

---

[19] While it is true that opinions (even by treating sources) that an individual is disabled and unable to work are not entitled to controlling weight or special significance, it does not mean that such opinions are to be rejected in their entirety as Defendant may imply. (Def.'s Brief at 11.) Social Security Ruling 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner," states: "[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored." Here, the ALJ explicitly noted Dr. Sheptak's opinion that Mr. Miller was "totally and permanently disabled from any and all occupations," and it is clear he did not ignore that opinion in arriving at his ultimate conclusion regarding Plaintiff's ability to perform substantial gainful activity.

[20] Contrary to Plaintiff's argument, the Court has been unable to find any opinion offered by Dr. Sotos as to the extent of Mr. Miller's disability. Plaintiff refers to the portion of the ALJ's opinion which states that "in January and March 1987, Dr. Sotos and Dr. Kasdan, respectively, indicated that the claimant was disabled," citing Tr. 173-239. However, a careful review of that portion of the record includes no statement by Dr. Sotos to that effect. (*See* Dr. Sotos' notes at Tr. 224, 228, 235.) Moreover, the statement by Dr. Kasdan to which the ALJ presumably refers (*see* Tr. 231, his only report dating from March 1987) indicates he would consider Mr. Miller disabled until he had reviewed a CT scan he had ordered to rule out a herniated disc and could assess the effects of a prescribed regimen of back exercises. The Court also notes that any statement by Dr. Sotos in January 1987 would have been made no more than approximately two months after his November 23, 1986 injury and both doctors would have made their statements prior to the initial surgery in May 1987.

22

based on the same objective evidence.  "Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."  Fargnoli, 247 F.3d at 42; see also Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (where conflicting medical evidence is presented, "the ALJ may choose who to credit but 'cannot reject evidence for no reason or for the wrong reason," but must consider all the evidence and explain the reason(s) for rejecting some portion of it.)   Here, the ALJ discussed the opinions of each of Plaintiff's treating physicians, as well as opinions rendered by non-examining sources, in hospital discharge records which incorporated limitations that applied only for the period immediately after his surgeries, and by one-time examiners who evaluated Plaintiff's condition long after his date last insured.   (Tr. 29-30.)  He also thoroughly explained why he declined to give any opinion, including those of Drs. Sheptak and Kasdan, controlling weight insofar as they suggested Plaintiff was unable to perform any work activity on a sustained basis prior to his date last insured.   (Tr. 30.)

The law is clear that this Court is not to re-weigh the evidence on appeal, but must determine if the record, as a whole, contains substantial evidence to support the ALJ's findings. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).   Where such

evidence exists and the ALJ has explained his reasoning, this Court may not reject those findings even if we would have made a different choice had we considered the matter *de novo*. *See* Claussen v. Chater, 950 F.Supp. 1287, 1292 (D. N.J. 1996)(although "reasonable minds can reach different conclusions following review of the evidentiary record upon which the Commissioner's decision is based, . . . . in such cases, a district court's function is to determine whether the record, as a whole, contains substantial evidence to support the Commissioner's findings"); *see also* Thompson v. Barnhart, 382 F. Supp.2d 740, 747 (E.D. Pa. 2005), and Casanova v. Barnhart, CA No. 03-4081, 2004 U.S. Dist. LEXIS 2519, *5-*7 (E.D. Pa. Jan. 30, 2004) (finding no error in ALJ's decision to accept opinion of one treating source over another where the reasons for doing so were set forth in the decision.) "When physicians draw different conclusions based on medical evidence, the ALJ must give greater weight to those physicians' opinions most consistent with the record as a whole." Odrick v. Barnhart, CA No. 02-8412, 2003 U.S. Dist. LEXIS 12093, *29 (E.D. Pa. July 11, 2003), *citing* 20 C.F.R. § 404.1527(d)(4). Our review of the record and the ALJ's decision leads to the conclusion that the ALJ did not err in weighing the opinions of Plaintiff's treating physicians and by giving greater weight to those of Dr. Kasdan rather than those of Dr. Sheptak, based on his determination that Dr. Kasdan's opinions were more consistent with the objective medical evidence.

24

3. *The ALJ improperly disregarded the Vocational Expert's testimony and relied on an incomplete hypothetical question.* Plaintiff argues that ALJ erred by ignoring Mr. Hoffman's response to a hypothetical question which incorporated the need to take more breaks, or longer breaks, than were normally offered by an employer, i.e., a 10-minute break in the morning and afternoon plus a 30-minute lunch break. Mr. Hoffman had responded that such an individual could not engage in substantial gainful activity. Plaintiff argues that medical evidence provided by Drs. Kasdan, Paul S. Lieber, and Theresa Silvaggio indicated that he needed to have a 10-minute break after every two hours of work and/or needed to change positions on a frequent or as needed basis. The ALJ erroneously rejected Mr. Hoffman's response to a hypothetical question which included these limitations and thus, there was no substantial evidence that Plaintiff could perform any work which incorporated them. (Plf.'s Brief at 17-18.)

We agree with Plaintiff's summary of the ALJ's questions and his rejection of Mr. Hoffman's response to the question which included a requirement that the hypothetical claimant needed to take "longer breaks, unscheduled breaks." (*See* Tr. at 31; 443-444.) We conclude, however, that Plaintiff's reliance on the opinions of Drs. Kasdan, Lieber, and Silvaggio for this argument is misplaced.

The statement by Dr. Kasdan to which Plaintiff refers was made

25

in the context of his recommendation to the workers compensation carrier that Plaintiff could do light work as a storeroom clerk "as long as he were allowed to take intermittent breaks that allowed him to sit down for 10 minutes at a time every two hours." (Tr. 136.) The ALJ limited Mr. Miller to sedentary work, not light work. Moreover, light duty work that requires the ability to sit down for ten minutes every two hours is not equivalent to sedentary work that requires a ten-minute break every two hours. Plaintiff fails to identify any point in the medical record where any physician made the latter a requirement for Mr. Miller to return to sedentary work.

Dr. Lieber examined Mr. Miller on July 25, 1994, more than three years after his date last insured. (Tr. 387-390.) He concluded that Plaintiff was "capable of full-time sedentary to light duty work, providing he can change positions on a frequent, as needed basis." (Tr. 390.) This statement is somewhat ambiguous in that it is unclear if the need to change positions frequently applies to light work, sedentary work, or both. Nor does the record include the physical capabilities form to which Dr. Lieber refers which could clarify this point.

Dr. Silvaggio performed an independent medical examination and records review in October 1996. (Tr. 394-399.) She reported that Mr. Miller stated he could "sit for 30 minutes, stand for 20-30 minutes and walk approximately 1 1/2 miles, however, he states he

26

takes breaks every half mile." He reported he could "drive for approximately one hour without any problems." (Tr. 396.) The Court fails to find any reference therein to the need to change positions on a frequent or as needed basis as Plaintiff asserts. Moreover, this portion of Dr. Silvaggio's report is based solely on Mr. Miller's statements made more than five years after his date last insured and Plaintiff has pointed to no other evidence in the record from the relevant time period which would independently support these statements. In sum, the medical evidence provided by Drs. Lieber and Silvaggio is not persuasive simply because it pertains to Plaintiff's condition well after his date last insured. We conclude that the ALJ did not err by rejecting the answer to his hypothetical question which incorporated these unsubstantiated requirements for additional breaks or change of position.

4. *The ALJ erred by improperly determining Plaintiff's residual functional capacity.* The ALJ concluded at step five of his analysis that Plaintiff's RFC precluded any work which required lifting or carrying more than 10 pounds, prolonged standing and walking, more than occasional balancing, stooping or climbing of ramps and stairs, any kneeling, crouching, crawling or climbing of ladders, ropes or scaffolds or more than occasional pushing or pulling with the lower extremities. (Tr. 32.)

Plaintiff argues that Dr. Sheptak had concluded in February 1990 that he was "totally and permanently disabled for any and all

27

occupations," based on his diagnostic tests and that other doctors supported that finding. He further argues that the ALJ erred by failing to cite any medical evidence to support his conclusion that Mr. Miller could engage in full-time sedentary work; moreover, the ALJ made a number of factual mistakes in this portion of his analysis. Thus, the conclusion that Plaintiff had the residual functional capacity to perform sedentary work is not supported by the record. (Plf.'s Brief at 19-20.)

Contrary to Plaintiff's argument that the ALJ failed to cite any medical evidence that he could engage in full-time sedentary work, as discussed above, Dr. Kasdan repeatedly concluded that he could return to light duty work. To the extent Dr. Sheptak disagreed with that conclusion as of February 1990, as further discussed above, the ALJ is obligated to weigh the evidence and determine which of two or more conflicting opinions is most consistent with the evidence, which he did.

The first alleged factual error cited by Plaintiff is the ALJ's comment that he had discontinued use of Darvocet[21] in 1990 whereas he actually continued using it until 1995 and began using it again in 1998 for pain in his back and left leg. (Plf.'s Brief at 20, *citing* Tr. 344, 384, 388, 396.) Mr. Miller wrote in his

---

[21]   Darvocet, a combination of acetaminophen and propoxyphene, is used to relieve mild to moderate pain. *See* the on-line medical dictionary provided by the National Institutes of Health at www.nlm.nih.gov/medlineplus, last visited June 1, 2007.

daily activities questionnaire dated July 14, 2003, that he took advil or tylenol two or three times a day "since MD took me off of darvocet [in] 1990." (Tr. 131.) The ALJ specifically cited to this portion of the record, Exhibit 3E, in his comments about Plaintiff's treatment. (Tr. 27.) There is strong evidence that Mr. Miller did, in fact, continue to take Darvocet at least through early 1995. See, for example, Tr. 391, noting that Dr. Kasdan refilled his prescription for Darvocet as of January 12, 1995, even though he had not treated Mr. Miller since 1991.  However, while Plaintiff may have been mistaken in his questionnaire about when he no longer took the drug, the ALJ mentioned this only in the section of his decision at which he discussed treatments for Plaintiff's impairments, i.e., drugs, intra-venous steroids, physical therapy, nutrition counseling, the TENS units, and a lumbosacral support brace.  (Tr. 27-28.)  Thus, to the extent the ALJ may have relied on erroneous information in this section of his analysis, we conclude such error was harmless in light of the numerous other facts on which the ALJ properly relied.

Second, Plaintiff argues that the ALJ misrepresented the fact that he could walk 1.5 miles, when, in reality, he had to rest after each half-mile and undertook such exercise only as part of his weight loss program. As Plaintiff points out, the ALJ cited to Dr. Kasdan's report of November 7, 1988, in which he states that Plaintiff "has lost 20 pounds and has followed an exercise program

which includes a walking program of a mile to a mile and a half a day." (Tr. 30, *citing* Tr. 275.) Nothing in Dr. Kasdan's report, however, states that Plaintiff must rest after each half mile. That information appears to be based on Dr. Silvaggio's report in which she noted Plaintiff could "walk approximately 1 1/2 miles, however, he states he takes breaks every half mile." (Tr. 396.) As noted above, that report was prepared in October 1996, at least five years after Plaintiff's date last insured. Mr. Miller does not identify and the Court's review of the entire record has failed to disclose such a comment made during to the relevant period.

Finally, in his decision, the ALJ wrote: "It is also significant to note the claimant testified that he continued to go coon hunting at night after his accident in November 1986." (Tr. 30.) Plaintiff argues that the ALJ erred because he was "under the impression that Plaintiff continued to coon hunt between 1986 and 1991 on a regular basis" when in fact he testified he hunted only one or two times in that period. (Plf.'s Brief at 21.) In questions regarding Plaintiff's activities, the ALJ asked how often he went hunting; Mr. Miller replied, "Once every three or four, maybe five months." (Tr. 436.) The dialogue continued:

ALJ:        Did you go this year?

Claimant: No, I haven't been out probably for a couple years.

ALJ:        Were you going out regular [sic] before that?

Claimant: Not regular but a couple times a month.

30

(Tr. 436-437.)

Later, when Plaintiff's attorney was questioning him, she asked:

> Right after your accident, [during] that 1986-1987 period where you had your surgeries, were you able to [go coon hunting]?

Claimant: No.

Attorney: Then between 1987 and 1991 when they were trying to get you to go back to work, were you able to coon hunt then?

Claimant: I think I did go once or twice.

(Tr. 441.)

The Court concludes that the ALJ did not mischaracterize Plaintiff's testimony.  Mr. Miller testified that between his accident in November 1986 and his surgeries in May and December 1987 he did not hunt at all; between 1987 and 1991, he hunted "once or twice;" and sometime about October 2002, i.e., two years before the hearing, he stopped hunting two to four times a year, i.e., once every three, four or five months.  Thus, his testimony is consistent with ALJ's comment that Mr. Miller "continued to go coon hunting at night after his accident in November 1986" and does not exaggerate or over-emphasize the import of his statements.[22]

Having considered each of the arguments raised by Plaintiff in

---

[22] The Court also notes that Mr. Miller reported on May 14, 2003,that he experienced wheezing when "he is doing activities such as coon hunting" (Tr. 163), further evidence that he continued to hunt.

31

the brief in support of his motion for summary judgment, we find none of those arguments persuasive and conclude that the ALJ's decision that Mr. Miller was not disabled is based on substantial evidence.   Plaintiff's motion for summary judgment in his favor is therefore denied.   An appropriate Order follows.

June ___5___, 2007                    _William L. Standish_
                                        William L. Standish
                                    United States District Judge

cc:   Counsel of Record

32